IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LIEN LOUNG SAETEUN,<br><br>Plaintiff,<br><br>v.<br><br>SERGIO ALBARRAN, et al.,<br><br>Defendants. | Case No.  26-cv-04743-CRB<br><br>**ORDER GRANTING TEMPORARY RESTRAINING ORDER AND RELEASING PETITIONER** |

Before the Court is Petitioner Lien Loung Saeteun's application for a temporary restraining order (TRO), filed in connection with his abrupt re-detention three days ago. See App. (dkt. 5).  For the foregoing reasons, the TRO is GRANTED.

## I.    BACKGROUND

Saeteun is a 53 year-old Laotian citizen who came to this country as a refugee in 1979 at the age of six.  See Pet. (dkt. 1) at 1.  His family had to flee Laos "to avoid persecution and violence, due to [his] father's military service under the CIA and U.S. affiliation in the Secret War in Laos."  Id. at 5.  Saeteun became a lawful permanent resident in 1979.  Id.  He grew up in low-income housing in East Oakland, surrounded by poverty and violence.  Id. at 2.  In 1999, he committed a drug crime for which he was sentenced to one year and four months in prison.  Id. at 6.  In 2001, ICE took him into custody; that same year, an immigration judge ordered him removed.  Id. at 6.  ICE released him from custody in 2002 on an Order of Supervision because it was unable to effectuate his removal in light of the absence of a treaty between Laos and the United States allowing for the repatriation of Laotian individuals.  See App. at 1.  ICE re-detained

and re-released Saeteun multiple times between 2002 and 2005, finding his removal not reasonably foreseeable. Pet. at 6. Cumulatively, he has been in immigration custody for more than seven months post-removal order. Id.; Kwak Decl. (dkt. 1-1) Ex A (Order of Supervision).

Saeteun has a compelling personal story and extensive ties in this country. He has a partner, six U.S. citizen daughters, one U.S. citizen son, and one U.S. citizen granddaughter. Pet. at 6; Reply (dkt. 10) at 1. He has maintained a clean criminal record for the past 24 years, cares for his mother who has brain damage, his uncle who is blind and has diminished mental capacity, his aunt who is unable to speak, and his elderly in-laws. Pet. at 7. He is a pillar of the Mien community in Oakland and has worked for the same employer for 20 years. Id. He has participated in multiple rehabilitation programs, is a part of the Christian church, and volunteers at community events. Id. He has continued to appear at his required ICE check-ins; in 2009, because of his regular attendance, he was switched from an every-six-months to an annual check-in schedule. Id. at 1.

On May 19, 2026, Saeteun appeared at his regular ICE check-in and was abruptly re-detained. Id. at 7. ICE Officer Garcia took Saeteun for a "medical screening," refusing to allow his counsel to be present; when Saeteun emerged around 10:36 AM, "he was in handcuffs." Id. at 7–8; see also Kwak Decl. ¶ 7. Garcia told Saeteun that he had a travel document for him, but would not show him the document or give the document to his attorney. Pet. at 7–8. Garcia would not state the reason for the detainment. Id. at 8. "The only document presented to Petitioner and his counsel . . . was a Form I-200, Warrant for Arrest of Alien," signed by "C. Morales." Kwak Decl. ¶ 8, Ex. B (Warrant for Arrest). Saeteun asserts that he was not presented with a document revoking his release and that he was not given an informal interview to respond to the revocation of his release. Pet. at 8.

Saeteun filed a habeas petition on May 19, 2026, seeking release from ICE custody because his "removal is not reasonably foreseeable" and because the revocation of release "violates governing regulations and [his] due process rights." See id. at 2. He also sought to enjoin the government from removing him to a third country without notice and an

2

United States District Court
Northern District of California

opportunity to be heard. Id. The same day, Saeteun applied for a TRO that would: order Respondents Sergio Albarran, Acting Field Director for the San Francisco Field Office of ICE Enforcement and Removal Operations, David J. Venturella, Acting Director of U.S. Immigration and Customs Enforcement, Markwayne Mullin, Secretary of U.S. Department of Homeland Security, and Todd Blanche, Acting Attorney General and the head of the Department of Justice (collectively, "Respondents") to (1) immediately release him; (2) enjoin Respondents from re-detaining him without following the procedures required for revocation of release by regulation, statute and constitutional due process; and (3) enjoin Respondents from removing him to a third country without affording him his statutory and constitutional rights in reopened removal proceedings. See App. at 1.

Saeteun provided notice of the Petition and a forthcoming application for a TRO, along with a copy of the Petition, to Respondents' counsel. Kwak Decl. re Notice (dkt. 6) ¶¶ 3–4. Later that day, counsel filed the application for the TRO and sent a copy to Respondents' counsel. Id. ¶¶ 10–11. Respondents have opposed the application, see Opp'n (dkt. 7), and Saeteun has filed a reply, see Reply. Today, the Court held a hearing on the application.

## II.    LEGAL STANDARD

A party seeking a temporary restraining order must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied." Friends of the Wild Swan v. Weber, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted). "[W]hen the Government is the opposing party," the final two factors "merge." Nken v. Holder, 556 U.S. 418, 435 (2009).

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. A "TRO 'should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing, and no longer.'" E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 779 (9th Cir. 2018) (quoting Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70, 415 U.S. 423, 439 (1974)).

## III.   DISCUSSION

This order discusses Respondents' threshold argument about jurisdiction before moving onto the basis for injunctive relief.

### A.   Jurisdiction

As a threshold matter, Respondents argue that the Court lacks jurisdiction over Saeteun's claims. Opp'n at 4. Respondents note that "[n]o court shall have jurisdiction to hear a cause or claim by or on behalf of any alien arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." Id. (quoting 8 U.S.C. § 1252(g)). That argument is a non-starter.

In Zadvydas v. Davis, 533 U.S. 678, 688 (2001), the Supreme Court explained that habeas petitions in which petitioners made "statutory and constitutional challenges to post-removal-period detention" were not challenges to the Attorney General's discretion. See also Ibarra-Perez v. United States, 154 F.4th 989, 997 (9th Cir. 2025) ("we have been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders"); Venega-Maltez v. Semaia, No. 5:26-cv-525-JAK (AGRx), 2026 WL 846035, at *5 (C.D. Cal. Mar. 24, 2026) (holding, where petitioner challenged detention and sought immediate release, that Petitioner was not seeking "relief based on a challenge to the decision to 'commence proceedings,' to the 'adjudicat[ion]' of his case, or the 'execution' of any corresponding removal order. Instead, he challenges his re-detention as one that violated his rights to due process.").

Here too, the Court has jurisdiction to hear Saeteun's challenge to his re-detention.

United States District Court
Northern District of California

**B.    <u>Winter</u> Factors**

Saeteun argues that he is entitled to injunctive relief because he has met all of the <u>Winter</u> factors.  <u>See</u> App. at 7–31.  His application for a TRO largely turns on the first factor: whether he is likely to prevail on the merits.  <u>See</u> <u>Baird v. Bonta</u>, 81 F.4th 1036, 1040 (9th Cir. 2023) ("The first factor 'is a threshold inquiry and is the most important factor.'") (quoting <u>Env't Prot. Info. Ctr. v. Carlson</u>, 968 F.3d 985, 989 (9th Cir. 2020)).

**1.    Likelihood of Success on the Merits**

Saeteun argues first that he is likely to succeed on his claim that his re-detention violates 8 U.S.C. § 1231(a), the governing regulations, and the Fifth Amendment Due Process Clause.

**a.    Section 1231(a)**

Saeteun argues first that his re-detention violates section 1231(a).  App. at 9.  Section 1231(a) governs the detention of individuals whose removal proceedings are complete.  <u>See</u> <u>Johnson v. Arteaga-Martinez</u>, 596 U.S. 573, 578 (2022).  After a final order of removal, the  government "shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A).  During that initial 90-day period, the government "shall" detain the noncitizen.  <u>Id.</u> § 1231(a)(2)(A).  The government may detain certain classes of immigrants, including those removed because of a criminal conviction, beyond the initial 90-day period.  <u>Id.</u> § 1231(a)(6).  But it may not do so forever.

In <u>Zadvydas</u>, 533 U.S. at 682, 699, the Supreme Court held that section 1231(a)(6) no longer authorizes detention when "removal is not reasonably foreseeable."  The Court explained that the first six months of detention were "presumptively reasonable."  <u>Id.</u> at 700–01.  After that, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  <u>Id.</u> at 701.  Courts consider the cumulative length of post-order detention.  <u>See</u> <u>Nguyen v. Scott</u>, No. 2:25-cv-01398, 2025 WL 2165995, at *7 (W.D. Wash. July 30, 2025).

Saeteun has spent a cumulative seven months in immigration custody.  Pet. at 2.  He

argues that his re-detention violates section 1231(a)(6) and the Fifth Amendment because Respondents cannot meet their burden of showing that his removal is reasonably foreseeable.  App. at 9.  He adds: "[t]here is no evidence that Laos has or will issue travel documents for Petitioner or that Petitioner is even eligible to be removed to Laos."  Id.  In its opposition, however, Respondents assert that ICE does have a travel document, which the government of Laos issued on April 6, 2026 and made valid for ninety days.  See Opp'n at 1, Ex. 2.

An important issue in this case, therefore, is whether this document is valid.  The Court has a number of questions about the validity of the document, including that the photograph is too dark to see, there is no "Place of Birth" indicated, there is no "Signature of bearer," and it is unclear to the Court how the government of Laos generated this document given its lack of treaty with the United States and Saeteun's assertion that he "never had any birth certificate, passport, or other identity documentation issued by Laos." See App. at 5–6.  The Court raised these questions at the hearing and will allow the parties time to address them.  The Court cannot assess the likely success of the section 1231(a) claim until those questions are answered.

### b.    Likelihood of Success: Violation of Regulations

Saeteun separately argues that he is likely to succeed on the merits of his claim that his re-detention violates the governing regulations.  See App. at 10 (citing 8 C.F.R § 241.4 (2026) and 8 C.F.R. § 241.13 (2026)).  He argues, too, that such violations are also due process violations.  See Reply at 4–7.[1]  Government agencies must follow their own regulations.  See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 852 (9th Cir. 2003); Morales Sanchez v. Bondi, 811 F. Supp. 3d 1166, 1175 (C.D. Cal. 2025) (government agencies must follow their own regulations, and . . . failure to do so renders actions unlawful"); Constantinovici v. Bondi, 806 F. Supp. 3d 1155, 1164 (S.D. Cal. 2025) (collecting cases).  Indeed, there is authority holding that "where ICE fails to follow its

---

[1] At the motion hearing, counsel for Respondents agreed that courts in this Circuit have held that failure to comply with these regulations violates the Due Process Clause.

United States District Court
Northern District of California

own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered." Roknfirooz v. Larose, No. 25-cv-2053-RSH-VET, 2025 WL 2646165, at *4 (S.D. Cal. Sept. 15, 2025).

The regulations at issue here are 8 C.F.R. § 241.4(l) or 8 C.F.R. § 241.13. App. at 10–15; Opp'n at 6. The applicable language in the two sections is almost identical. Section 241.13(i) permits the government to revoke an alien's release "and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." That section requires that "[u]pon revocation, the alien will be [1] notified of the reasons for revocation of his or her release," and that [2] [t]he Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). Similarly, section 241.4(l)(1) requires that "[u]pon revocation, the alien will be [1] notified of the reasons for revocation of his or her release or parole" and that [2] "[t]he alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification."

Saeteun asserts that Respondents did not notify him of the reason for his revocation, see App. at 13, other than Garcia saying that ICE had a travel document for him, see Pet. at 7. He asserts that the only document he received at the time of his re-detention was a "Warrant for Arrest of Alien," which contains no reasons. See id. at 5; Kwak Decl. ¶ 8 ("The only document presented to Petitioner and his counsel upon his re-detainment was a Form I-200, Warrant for Arrest of Alien"), Ex. B. Saeteun also asserts that Respondents did not "provide [him] with an opportunity to respond to these reasons at a prompt, informal interview." App. at 13.

### 2. Informal Interview

Respondents state that they did provide Saeteun with an informal interview. See Opp'n at 2 ("On that same day, ERO conducted an informal interview with Petitioner

pursuant to 8 C.F.R. §§ 241.4(l) and 241.13(i), and he declined to make a statement."). In support of this assertion, Respondents cite to a purported "Alien Informal Interview" document. See Opp'n Ex. 4. The document states: "On [blank space for date, filled it to say 05/19/2026], I conducted an initial informal interview of the detainee listed in order to afford the alien an opportunity to respond to the reasons for revocation of his or her order of supervision stated in the notification letter." Id.[2] The form therefore anticipates that a detainee will have been given a "notification letter" to which he should have the opportunity to respond. See id.; see also Sun v. Noem, No. 3:25-cv-02433-CAB-MMP, 2025 WL 2800037, at *2 (S.D. Cal. Sept. 30, 2025) (holding that four-paragraph notice that gives no information on why release is being revoked . . . is insufficient.").

Saeteun's reply brief raises significant problems with the informal interview. First, Saeteun and his counsel were never notified that the government was conducting an interview. Reply at 2; Kwak Decl. ISO Reply (dkt. 10-1) ¶¶ 8–11. Saeteun's counsel (who had demonstrated to Garcia that she was Saeteun's counsel) asked to be present during Saeteun's medical screening, and when that was denied, asked to be present once the medical screening concluded. Kwak Decl. ISO Reply ¶¶ 4–5. Garcia agreed. Id. ¶ 5. That did not happen. See also id. ("Had I known or was given notice that ICE was conducting an informal interview, I would have stayed and demanded that I be present as his Counsel."). Second, Saeteun's request that his counsel be present for the interview was also denied. Id. ¶¶ 5–9. ICE officers "urged [Saeteun] to sign an acknowledgement form." Id. ¶ 8. Saeteun refused to sign the form and stated that he wanted his attorney present. Id. ¶ 9. Saeteun asserts that "[i]t was during this interview that Respondents allege Petitioner 'declined to make a statement,'" but he did make the statement—not reflected on the Alien Informal Interview document—that he wanted his counsel present. Reply at 2 (citing Opp'n Ex. 4). Third, ICE initially told Saeteun that the reason he was being detained was his criminal history. See Kwak Decl. ISO Reply at 8. After the interview, while Saeteun

---

[2] There is no time indicated for when the informal interview took place.

was with his family in a visitation room, an ICE officer came in and told Saeteun that he misspoke about the reason for Saeteun's detention.  Id. ¶ 12.  The officer stated that "the reason for Petitioner[']s detention and OSUP revocation was that ICE retained a travel document to Laos for him."  Id.  But ICE did not provide Saeteun with a second interview after ICE provided that changed basis for the revocation.  Id.  He therefore had no opportunity to respond to this changed basis for the revocation in an interview, in contravention of 8 C.F.R. § 241.13(i)(3) ("to afford the alien an opportunity to respond to the reasons for revocation") and 241.4(l)(1) ("to afford the alien an opportunity to respond to the reasons for revocation").  Id.

Saeteun therefore argues reasonably that "There is no indication or evidence that a procedurally adequate informal interview or opportunity to respond was provided to Petitioner."  Reply at 3.

### 3.    Notice of Reasons for Revocation

Respondents next point to a "Notice of Revocation of Release" as evidence that Saeteun was notified of the reasons for the revocation of his release.  Opp'n at 1, Ex. 3. The document states: "Your release has been revoked pursuant to 8 C.F.R. § 241.4(l), for the following reason(s)" after which there is an X next to "The purposes of release have been served" and "ICE has obtained a travel document and scheduled your removal to take place no later than: [date filled in to say 07/06/2026]."  See Opp'n Ex. 3 at 1.  It also states "On [date filled in to say 05/19/2026], you will be afforded an informal interview at which you will be given an opportunity to respond to the reasons for this revocation."  Id. at 2. Field Office Director Sergio Albarran signed the document on May 19, 2026 at 13:00:41. Id.[3]   This is two and a half hours after Saeteun's counsel saw him in handcuffs coming out of the "medical screening."  Kwak Decl. ¶ 7.

---

[3] Saeteun argues that "the individual who revoked Petitioner's release did not have authority to do so."  See App. at 14 (citing 8 C.F.R. § 241.4(l)(2)).  He is referring to a Supervisory Detention and Deportation Officer, who signed the warrant for arrest.  See id. But it was the San Francisco Field Office Director who signed the Notice of Revocation, see Opp'n Ex. 3, which would be adequate under the regulations, see 8 C.F.R. § 241.4(l)(2) (Field Office Director has authority under to revoke an alien's release).

United States District Court
Northern District of California

The problem with this notice is that it is unclear whether Saeteun saw it, and its "travel document" reason, at all, let alone in advance of his informal interview. See Opp'n Ex. 3 at 2 ("Proof of Service" section of the Notice of Revocation of Release document is blank). Indeed, the evidence suggests that ICE had not settled on the "travel documents" reason for Saeteun's detention until after the informal interview. See Kwan Decl. ISO Reply ¶ 8 (Saeteun informed that criminal history was the reason for his detention), ¶ 12 (Saeteun informed during visitation with family—after informal interview—that ICE officer had misspoken and travel document was the reason for his detention).

Saeteun therefore appears likely to succeed in his argument that he did not have the reasons for his re-detention in advance of his informal interview, which also means that he did not have a meaningful interview at which he could respond to those reasons.[4] At best, there appears to be a dispute of fact about these matters.[5] There is no dispute that Saeteun's counsel was prevented from participating in his interview, despite her request to do so and his request to have her there. Saeteun is therefore likely to prevail on his argument that Respondents violated their own regulations as to his re-detention, and his related argument that such violations also violate the Due Process Clause.

### 4.    Other Winter Factors

Saeteun has also demonstrated a likelihood of immediate, irreparable injury in the absence of temporary relief. The likely unconstitutional deprivation of liberty that Saeteun faces is an immediate and irreparable harm. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). The Ninth Circuit has recognized "the irreparable harm imposed on

---

[4] In addition, the travel document was not provided to Saeteun's counsel in time for counsel or Saeteun himself to challenge the revocation of his release in the informal interview. Saeteun's counsel states that "the first time a copy of the travel document was provided to anyone on behalf of Petitioner" was at 3:05 PM, after the habeas petition was filed. Kwak Decl. ISO Reply ¶ 15. The document was issued on April 6, 2026. See Opp'n Ex. 2.

[5] Accordingly, the Court SETS this matter for an evidentiary hearing on June 23, 2026, at 10:00 AM. Saeteun must be present.

anyone subject to immigration detention." Id. at 995. In Saeteun's case, that harm will fall not only on him but on the family he supports—including his paralyzed mother, mute aunt, blind uncle, and elderly parents-in-law, to whom he is a caregiver. See App. at 28–29.

The final two Winter factors, the balance of the equities and public interest, also weigh heavily in favor of granting temporary relief. "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." Jorge M. F. v. Wilkinson, No. 21-cv-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (cleaned up); see Melendres, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)); Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). As other courts in this district and others have concluded under similar circumstances, "the potential harm to [Saeteun] is significant, while the potential harm to the government is minimal." Pablo Sequen v. Kaiser, No. 25-cv-06487-PCP, 2025 WL 2203419, at *3 (N.D. Cal. Aug. 1, 2025). At most, the government faces a short delay in detaining Saeteun if it ultimately demonstrates that his detention is appropriate. The government stated at the motion hearing that it is not concerned that Saeteun will fail to comply with the same terms and conditions concerning release that were in place before his re-detention. The government is also not "harmed in any legally cognizable sense by being enjoined from constitutional violations." Zepeda v. U.S. Immigr. & Nat. Serv., 753 F.2d 719, 727 (9th Cir. 1983).

Faced with "a conflict between [administrative] concerns and preventable human suffering, [the Court has] little difficulty concluding that the balance of hardships tips decidedly in [Petitioner's] favor." Hernandez, 872 F.3d at 996) (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983)).

## IV.   CONCLUSION

A TRO immediately releasing Saeteun is appropriate to return him to the status quo.

11

E. Bay Sanctuary Covenant, 932 F.3d at 779.  The status quo refers to "the last uncontested status which preceded the pending controversy." Doe v. Noem, 778 F. Supp. 3d 1151, 1166 (W.D. Wash. 2025) (quoting GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000)).  That is the moment prior to Petitioner's likely illegal re-detention. See Kuzmenko v. Phillips, No. 25-cv-00663, 2025 WL 779743, at *2 (E.D. Cal. Mar. 10, 2025) (granting a TRO requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).  Because Saeteun satisfies all requirements for temporary injunctive relief and such relief is necessary to restore the status quo, the application for a TRO is granted as detailed below.

Finally, the Court exercises its discretion under Rule 65(c) to dispense with the filing of bond.  "[T]here is no realistic likelihood of harm to the [Respondents] from enjoining [their] conduct." Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003). Therefore, no security is needed to ensure that Respondents will be reimbursed for "costs and damages sustained by . . . hav[ing] been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

## V.     ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Saeteun's application for a TRO is **GRANTED** to preserve the status quo pending an evidentiary hearing on this matter, set for June 23, 2026.  Respondents are **ORDERED** to immediately release Saeteun from Respondents' custody, subject to the same terms and conditions that were in place before his re-detention, and are **ENJOINED AND RESTRAINED** from re-detaining Petitioner absent the required procedural protections.  Respondents are further **ENJOINED** from removing Saeteun from the United States to any country, including Laos.[6]  The parties have agreed that this order shall remain in effect until the evidentiary hearing currently set for June 23, 2026.  The parties may take reasonable discovery in

---

[6] At the motion hearing, counsel for Respondents represented to the Court that Respondents have no intention of removing Saeteun to a third country, and that should that intention change, Respondents would notify the Court prior to any detention and follow the rules and regulations on that subject.

United States District Court
Northern District of California

advance of that hearing.  Respondents shall provide a status report confirming Saeteun's release **within one day**.  Respondents shall also provide the Court with information about (1) what agreement the United States has with the government of Laos to accept individuals removed from this country, generally, and (2) the process by which the travel document in this case was made.

**IT IS SO ORDERED.**

Dated: May  22 , 2026



CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

13